IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
August 12, 2025 Session

## KEVIN D. BUFORD v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1355    Angelita Blackshear Dalton, Judge**

_____

### No. M2024-01383-CCA-R3-PC
_____

Petitioner, Kevin D. Buford, appeals the denial of his post-conviction petition, arguing that the post-conviction erred in denying his claims that trial counsel was ineffective by failing to seek a continuance, failing to establish a defense, calling him to testify, and failing to call an expert witness.  He further argues that trial counsel's representation resulted in prejudice and that he is entitled to relief based on the cumulative effect of trial counsel's errors.  Following our review of the entire record, the briefs of the parties, and arguments of counsel, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which J. ROSS DYER and TOM GREENHOLTZ, JJ., joined.

Kyle D. Parks, Nashville, Tennessee, for the appellant, Kevin D. Buford.

Jonathan Skrmetti, Attorney General and Reporter; Abigail H. Hornsby, Assistant Attorney General; Ronald L. Coleman, Senior Assistant Attorney General; Glen R. Funk, District Attorney General; and Amy Hunter, Assistant District Attorney General, for the appellee, State of Tennessee.

# OPINION

## Factual and Procedural Background

*Trial*

Petitioner, who was sixteen years old at the time of the offenses, along with four co-defendants, was indicted for one count of felony murder and one count of attempted especially aggravated robbery for offenses committed on January 21, 2008, against the victim, Billy Jack Shane Tudor.  Prior to trial, Petitioner's case was severed from his co-defendants.  On July 6, 2009, while represented by his first attorney, Petitioner pled guilty to second degree murder and agreed to testify truthfully against his co-defendants: Kevin Buford Sr.[1] (Petitioner's father), Robert Buford (Petitioner's uncle), Deangelo Buford (Petitioner's brother), and Raymond Pirtle (Petitioner's friend) in exchange for a forty-year sentence and dismissal of the robbery charge.  Petitioner later withdrew his guilty plea when his second attorney was appointed, and his case was set for trial.  Approximately four months prior to trial, trial counsel was appointed, and the case went to trial as scheduled. *State v. Buford*, No. M2010-02160-CCA-R3-CD, 2011 WL 6916443, at *2 (Tenn. Crim. App. Dec. 28, 2011).

The facts of the case pertinent to this appeal show that Petitioner had not met his father, Kevin Sr., until six months before the offenses.  Although Petitioner's mother had discouraged any contact between the two, Petitioner wanted to know Kevin Sr., and meeting Kevin Sr. was the "most important thing to him." *Id.*  Petitioner "asked around" about Kevin Sr. who eventually called Petitioner. *Id.*  Because Kevin Sr. was not allowed at Petitioner's house, Petitioner would sneak out of the house and meet Kevin Sr. down the street.  At first, Petitioner and Kevin Sr. played video games and did "father and son things." *Id.*  However, after a few months, Kevin Sr. lost his job, and Petitioner noticed a difference in him.  Petitioner said that Kevin Sr. began drinking and using drugs. *Id.*

Petitioner was friends with Raymond, and one day Raymond left a 9mm Smith and Wesson gun with Petitioner at Petitioner's house. *Id.*  Petitioner testified that he "put [the] gun up" and called Kevin Sr. and told him about it. *Id.*  Several days later, Petitioner met Kevin Sr. down the street and gave the gun to him.  Petitioner testified that he next saw Kevin Sr. on the day of the robbery and shooting. *Id.*  That day, Kevin Sr. called Petitioner while Petitioner was at his aunt's home in Madison, Tennessee.  Petitioner and Deangelo then met Kevin Sr. at 8:00 or 9:00 a.m., and they ran errands, got a haircut, and ate lunch. *Id.* at *5.  At some point, Kevin Sr. began asking who had given Petitioner the gun, and Petitioner said that Raymond had given it to him.  Kevin Sr. then suggested that they

---

[1] Because several of the co-defendant's share the same last name, for clarity, we will refer to each of them by their first name.  Petitioner's father will be referred to as "Kevin Sr."  No disrespect is intended.

contact Raymond to help with a robbery. Petitioner said that he told Kevin Sr. that he did not "know how to do no robbery," but Kevin Sr. said that he would show him. *Id.*

On January 21, 2008, Petitioner went to Raymond's residence and invited Raymond "to do a robbery" with him, Kevin Sr., and Deangelo. *Id.* at *2. Raymond agreed and got into the car with the men, and they drove to a Burger King on Gallatin Road. Kevin, Sr., who had been driving, asked Raymond if he knew "how to do a robbery," and Raymond responded affirmatively. *Id.* Kevin Sr. then said, "Well, a friend of mine told me about this car lot that's supposed to have some drugs and some money in there. They ain't got no guns, so it should be easy to go in there and get it." *Id.* According to Raymond, he, Petitioner, and Deangelo, who had the gun, got out of the car and walked toward the car lot. *Id.* However, they decided "it wasn't good for us," so they returned to the vehicle. When Kevin Sr. asked what happened, the men responded, "They didn't let us in." *Id.* Kevin Sr. insisted that they try again, but the second attempt was also unsuccessful. *Id.*

Kevin Sr. next drove to an Auto Zone and told the others to wait in the car while he checked for surveillance cameras. Kevin Sr. returned to the vehicle, made a brief phone call, and then Raymond arranged to buy marijuana from someone called "Edwards." *Id.* They drove to purchase the marijuana, and then went to pick up Robert from work. Kevin Sr. then drove to a liquor store and said, "Y'all stay in the car; fixing to go in here and get some liquor, so [ ] it'll look like we are drinking." *Id.* After buying liquor, Kevin Sr. instructed Raymond to arrange to buy a "quarter bag [of] weed," Raymond arranged to meet "Edwards" to buy more marijuana. *Id.* They arrived at the agreed upon location, and Raymond learned that Kevin Sr. planned to rob "Edwards." *Id.* Robert was standing outside of the vehicle when "Edwards" approached and began talking to Raymond. Robert asked "Edwards" for a cigarette, and when "Edwards" reached into his pocket, Robert robbed him. *Id.* Kevin Sr. then drove away, leaving Robert behind, but he later picked Robert up at another location. *Id.*

Kevin Sr. then drove down Clarksville Pike, and told the others, "Y'all got fifteen minutes to do a robbery, because I gotta go pick up my wife from work." *Id.* at *3. He pulled into a car wash, and the victim walked by the group while counting some money. Kevin Sr. said, "He got some money." Raymond described Petitioner as "a little hyper" because they had been drinking and smoking marijuana all day. *Id.* Robert handed a gun to Petitioner, and the two men got out of the vehicle. Kevin Sr. drove across the street and parked in a grocery store parking lot. *Id.* Raymond said after Kevin Sr. parked, Kevin Sr. got out of the car and walked across the street "to help." *Id.* Raymond saw the victim punch Petitioner, and the two men "got into a little fight and the gun went off" striking the victim once and causing his death. *Id.* at *1 and 4. Petitioner, Robert, and Raymond then ran across the street back to the car. According to Raymond, Kevin Sr. never threatened Deangelo or Petitioner into committing robbery. *Id.* at *3.

- 3 -

Raymond agreed that Kevin Sr. was "calling the shots" and that they did not complete the robbery at the car lot because Raymond, Petitioner, and Deangelo were scared. Raymond described Kevin Sr. as not happy and "a little bit" frustrated with them for not completing that robbery. *Id.*

Through his investigation, Metropolitan Nashville Police Department ("MNPD") officer Chris Steele obtained a vehicle description and license plate number which led him to Kevin Sr.'s vehicle. *Id.* When he spoke to Kevin Sr., he initially claimed that only Deangelo was in the car with him the day of the victim's murder but later named Petitioner. Based upon this information, Petitioner and Deangelo were transported to the police station and interviewed. *Id.*

During the interview, Petitioner initially denied being at the car wash or having any involvement with the robbery and murder of the victim. After police advised him that he could be charged as an adult, Petitioner admitted that he, Raymond, and "some other dude" were at the car wash. *Id.* Petitioner said that Raymond identified the victim as having "some money," and Petitioner "tried to rob him." *Id.* Petitioner described the robbery and said that the victim turned around and hit him. When the victim hit Petitioner, the gun went off, and Petitioner and Raymond ran across the street. *Id.* Petitioner described the gun as being silver and told officers that he gave it to Raymond after the robbery and murder. *Id.*

Petitioner told the officers that before the shooting, he was at a park on King's Lane and that he and Raymond walked to the car wash from the park. Petitioner denied that he and Raymond discussed robbing someone. *Id.* at *4. Petitioner claimed that Kevin Sr. and Deangelo were not present during the robbery and murder but later came to the location to pick him up. He said that Kevin Sr.'s wife was driving the vehicle. *Id.* Petitioner maintained that Kevin Sr. knew nothing of the robbery, explaining that he called Kevin Sr. to pick him up because he was locked out of the house. *Id.*

Based upon Petitioner's references during the interview to "Little Ray," police located Raymond and interviewed him. Raymond confirmed information concerning the course of events. *Id.* At trial, Sergeant Steele testified that the gun used during the robbery was never found. He also said that there were no additional safeguards for juveniles during interrogations and that the sixteen-year-old Petitioner was deemed old enough to read and understand *Miranda* rights. *Id.* Sergeant Steele noted that Petitioner was asleep when officers took him for questioning, and he did not show any signs of impairment. The investigation revealed that only one shot was fired during the incident. *Id.*

At trial, Petitioner testified that he went to Raymond's home and invited him to join Kevin Sr., Deangelo, and Petitioner, and Raymond agreed. He said that on the way to the car lot, Kevin Sr. told them how to accomplish the robbery. Petitioner testified that they were scared to complete the robbery and "made up a story to tell" Kevin Sr. Petitioner

- 4 -

testified that Kevin Sr. did not say much, but Petitioner could tell that he was mad that they had not completed the robbery. *Id.* When Kevin Sr. left the Auto Zone, Petitioner said that he was "relieved" when they drove away, but he described Kevin Sr. as "mad" and "frustrated." *Id.*

After Raymond purchased marijuana from "Edwards," Kevin Sr. rolled several joints that they all smoked. *Id.* Petitioner recalled that Kevin Sr. was driving "past downtown" when they saw Petitioner's uncle Robert, whom Petitioner estimated to be thirty-nine years old. Robert joined them and they drove to a liquor store on Jefferson Street where Kevin Sr. purchased liquor. *Id.* When Kevin Sr. returned to the car, he wanted Raymond to rob someone but then changed his mind because there were "too many people in the store." Kevin Sr. purchased three small bottles of "clear liquor" and everyone in the vehicle drank some of it. *Id.* Petitioner testified that he did not know how much he drank and that it was the first time he had consumed alcohol. *Id.*

Petitioner testified that Raymond called "Edwards" and arranged to meet him at a store to buy more marijuana. When "Edwards" arrived, he walked over to the car, and Robert robbed him with Raymond's gun. *Id.* Petitioner said that he believed they were buying marijuana and did not know that Robert was going to rob "Edwards." Petitioner also said that he was confused and "didn't understand why they did it." *Id.*

After the robbery, Kevin Sr. drove to a car wash on Clarksville Pike where they saw the victim. *Id.* at *6. Kevin Sr. said the victim had money and instructed Petitioner to rob him. Kevin Sr. also sent Robert with Petitioner "to make sure." *Id.* Robert gave Petitioner a gun as Petitioner was getting out of the car, and they walked toward the victim. Petitioner testified that he told the victim, "Come on with it," and the victim turned and hit Petitioner. *Id.* Petitioner said that he did not know what to do, and he heard Robert say, "Shoot'im. Shoot'im," so he shot the victim. *Id.* Petitioner testified that he fired the gun once and then ran toward the car. Once back in the car "everybody was telling [Petitioner][he] was stupid." *Id.* Kevin Sr. told everyone in the vehicle, "if we mention his name, then we know what it is." Petitioner interpreted this statement as a threat. Petitioner said that he placed the gun in the car under Kevin Sr.'s seat. *Id.*

Petitioner testified that Kevin Sr. drove him and Deangelo home. Petitioner recalled that he was "scared" and "crying and stuff" but eventually went to sleep. At approximately 2:00 p.m., police officers woke him and took him to the police station for questioning. *Id.* Petitioner said that his statement to police was a lie because Kevin Sr. told him not to mention Kevin Sr.'s name. Petitioner testified that he tried to "protect" Kevin Sr. because "he my family and, if I mention his name, then he could easily get to me." *Id.*

Petitioner agreed at trial that he had previously pled guilty in this case and, as part of the plea, he had made a proffer of evidence. He confirmed that his proffer was truthful.

Petitioner subsequently withdrew his guilty plea because he believed his attorney at the time had given him bad advice. *Id.*

On cross-examination, Petitioner agreed that the State's offer was that he would plead guilty to second degree murder in exchange for testifying at Kevin Sr.'s trial. One or two weeks before Kevin Sr.'s trial, Petitioner said that he wanted to withdraw his plea, and he did not testify against Kevin Sr. *Id.*

Petitioner's mother, Trixie Williams, testified that approximately six months before the offense in this case, Petitioner expressed a desire to know Kevin Sr. Ms. Williams did not approve of Petitioner meeting Kevin Sr. because Kevin Sr. was an "abusive person." *Id.* She said that Petitioner contacted Kevin Sr. against her wishes. *Id.*

Petitioner was convicted of felony murder and attempted especially aggravated robbery, and the trial court imposed concurrent sentences of life for the murder conviction and ten years for the robbery conviction. This court affirmed the convictions, and our supreme court denied Petitioner's Rule 11 application for permission to appeal. *Id.* at *9.

*Post-Conviction Proceedings*

Petitioner filed a petition for post-conviction relief on September 27, 2012, which was amended on November 20, 2015.[2] He alleged that trial counsel was ineffective on several grounds and that he was prejudiced by counsel's performance. After a hearing on the petition in 2017, the post-conviction court addressed each of Petitioner's claims and concluded that he failed to demonstrate that trial counsel rendered deficient performance. The court did find that appellate counsel's failure to timely file an application to our supreme court was deficient performance; however, it concluded that Petitioner did not suffer any prejudice because it was "doubtful" the supreme court would have granted the application.

Petitioner filed a timely appeal to this court in which the State conceded, and we concluded, that Petitioner was entitled to a delayed appeal to the supreme court. *Buford v. State*, No. M2017-01340-CCA-R3-PC, 2018 WL 4001100, at *1 (Tenn. Crim. App. Aug. 21, 2018). This court reversed the denial of post-conviction relief and "instruct[ed] the post-conviction court on remand to allow the amendment of the petition if new issues ar[ose] from handling of the delayed appeal." *Id.* at *2. On remand, the post-conviction court entered an order granting Petitioner a new delayed appeal to the supreme court, which the supreme court denied.

---

[2] There is nothing in the record explaining the three-year delay between the filing of the initial post-conviction petition and the amended petition. The amended petition or notice that no amendment will be filed must be filed within thirty days of the entry of the preliminary order appointing counsel, unless extended for good cause. T.C.A. § 40-30-107(b)(2).

At the second post-conviction hearing in October 2023, the subject of this appeal, trial counsel testified that he was appointed to represent Petitioner after Petitioner's case had been set for trial. Although he had "handled some murder cases," he had not handled one through a jury trial. He had tried some aggravated robbery cases. Trial counsel testified that he met with Petitioner and hired an investigator. When asked about Petitioner's defense, trial counsel replied: "Well, based upon the evidence, it was a pretty tough one. The best defense that I came up with was that [Petitioner] was influenced by [Kevin Sr.]." Trial counsel and the investigator spoke with Kevin Sr. who said he was not willing to testify at Petitioner's trial.

Trial counsel believed that Petitioner and Raymond Pirtle would be tried as co-defendants, but Raymond's case was severed approximately one week before trial. Trial counsel did not request a continuance because he did not believe the severance would change his trial strategy. He said: "I want to say that I was fairly confident in the case and what I knew about it that I didn't feel the need to change that strategy." Trial counsel further testified that he had received and reviewed the file materials from Petitioner's previous two attorneys. He said:

> So I spent a whole lot of time going through that file to see what had been done previously, getting my feet underneath me. And then I sat down once I got funds for [the investigator], and we sat down and went through it. And it was kind of one of those things that is obvious for me. I felt fairly confident in the things. I mean, there were some things you always wish you feel more confident about, but I didn't feel like there was necessarily a need to continue the matter, and I felt confident enough we could roll with it.

Trial counsel also noted that he worked in the same building as Raymond's trial counsel, "so we talked a lot about the case."

Trial counsel testified that he did not seek an expert witness to support the defense strategy of undue influence or duress. His strategy was to have Petitioner testify because that gave Petitioner the best chance to convince the jury that he was under the undue influence of Kevin Sr., and "[t]he only corroborating evidence I would have said I had was just kind of what the record as a whole reflected and the way that certain events went down that night." Petitioner had confessed his involvement in the offenses during his interview with police. Trial counsel agreed that Raymond's testimony would have minimized any influence Kevin Sr. or any other adult would have had over Petitioner.

Trial counsel did not recall whether he mentioned undue influence or duress during his opening statement and deferred to the record. He agreed that Petitioner was called as a witness after the State's proof, and Petitioner admitted to being the shooter. He recalled that Petitioner also acknowledged he appeared in the video of the shooting. When trial counsel was asked what he hoped the jury would do with that information, trial counsel

- 7 -

testified: "Well, it's what I was hoping, was that's where we were going to start talking about the influence that he was put under in order to go through with that, sir." Trial counsel did not dispute that the trial transcript reflected that he did not ask Petitioner specifically about any undue influence or duress from Kevin Sr. He admitted he had not requested a jury instruction on undue influence or duress. Trial counsel testified he did not "necessarily think that it amounted to duress, more of an influence, and that could just be a matter of semantics and word definitions."

Trial counsel agreed that he asked Petitioner at trial about his withdrawn guilty plea. He did not recall whether he was present for a jury-out hearing during which the trial judge had barred the State from mentioning the guilty plea. Trial counsel also did not recall that he had filed a motion in limine asking the court to exclude mention of the plea. He deferred to the record as to whether the State informed the trial court that Petitioner had opened the door to informing the jury that he had previously pled guilty to the offenses based upon trial counsel's line of questioning.

Trial counsel testified that he did not recall encouraging Petitioner to testify at trial; they "kind of made the decision together." When asked if the benefits of Petitioner testifying outweighed the risks, trial counsel said: "I think it's a crap shoot either way. Yes, sir. I'm not going to disagree with that statement." Trial counsel further testified:

I thought by him getting up there they could see him as I saw him, as a young man, because he's a likable guy. He was a likable guy. And I wanted the jury to see that side of him as being somebody, not this monster that he had kind of portrayed out to be, and just being somebody that was steered wrong. Because he is personable. I liked my time with him.

Trial counsel agreed that the evidence against Petitioner was overwhelming which did not make the case any less important, "but it certainly diminished any argument that I had in a lot of ways." He did not believe that he "discounted it to any degree because it was as much. I wouldn't do that."

Trial counsel did not recall whether he mentioned the defenses of undue influence or duress to Petitioner. He did not believe he was aware that Raymond was going to testify against Petitioner at trial. Trial counsel agreed Raymond's testimony could have been a reason to request a continuance, but he did not "see it at the time." He pointed out that prior counsel had done "a lot of legwork" on Petitioner's case. Trial counsel intentionally asked Petitioner about the withdrawn guilty plea but said "hindsight being 20/20, it is always clear, you wish you would do other things potentially."

On cross-examination, trial counsel testified that he was the third attorney to represent Petitioner. He agreed that previous counsel extensively prepared for the case, and trial counsel reviewed all the prior work. Trial counsel testified that because he was

not entitled to a co-defendant's statement until after their testimony, it would not have benefited him to request a continuance when he learned that Raymond was going to testify against Petitioner. Trial counsel said he consulted Raymond's attorney about the case, and he also consulted with other attorneys. He believed that he was as prepared as he could possibly be for Petitioner's trial.

Trial counsel said that asking Petitioner about his guilty plea was a tactical decision because he was afraid that Petitioner would mention it on his own due to his young age. He further agreed that he wanted to "get out any type of negative inferences" before getting to the "meat" of Petitioner's testimony. Prior counsel had filed a motion to suppress Petitioner's statement to police which the trial court denied. Trial counsel said that he and Petitioner talked about whether Petitioner would testify and it was a joint decision. They practiced Petitioner's direct examination and discussed what would happen during cross-examination.

Because of the strong evidence against Petitioner, trial counsel thought the best outcome would be for Petitioner to be convicted of a lesser-included offense. There were independent witnesses who identified Petitioner as being at the scene and coming back to the car after the murder and robbery. There was also a color surveillance video of the offenses. Trial counsel agreed that he made a tactical decision as to how to question Petitioner at trial in hopes of having the jury view him as a "kid" and "somebody who has a personality and something to offer." He also wanted to show the jury that Petitioner was honest by asking him about the withdrawn guilty plea. Trial counsel did not believe that he had a reasonable basis to ask for a jury instruction on duress. He also reviewed Petitioner's psychological evaluation from juvenile court and there was nothing to show that Petitioner was incompetent nor was there any information in Petitioner's school records to show diminished capacity.

Trial counsel testified that he considered calling Kevin Sr. as a witness, but when they interviewed him at South Central Correctional Facility, Kevin Sr. indicated that he was "absolutely not" interested in testifying on Petitioner's behalf. Trial counsel agreed that before trial, the State offered for Petitioner to plead guilty to second degree murder, and Petitioner declined the offer. On redirect examination, when asked why he did not believe that a continuance would have been helpful after Raymond and Petitioner's trials were severed, trial counsel replied: "Man, after you went through that record file, I don't think there was a whole lot that was going to help anything, to be honest with you, sir." However, he denied that this "shaded" his desire to zealously advocate for Petitioner. Tria counsel agreed that Petitioner answered questions at trial as expected. There were no surprises in his testimony.

Deanglo testified that he pled guilty to facilitation of first degree murder and received a sixteen-year sentence to be served at thirty percent. He was incarcerated from 2008 until 2013 and was no longer on parole at the time of trial. Deangelo felt that they

were "just kind of like - - almost like forced and just pushed in the direction of just doing something." He said that Kevin Sr. did all the driving that day, and Deanglo did not recall seeing a weapon "until things were supposed to happen." Deangelo testified that Kevin Sr. talked about robbery and that he needed gas money. He remembered that Kevin Sr. and Robert were drinking, and Kevin Sr. was giving alcohol to "them." Deangelo denied drinking or smoking anything.

Deangelo recalled that when Raymond got out of the car to buy marijuana from "Edwards" a second time, Raymond pulled a gun and robbed him. He said Kevin Sr. and Robert had been trying to convince him, Petitioner, or Raymond, to commit a robbery. Deangelo said it did not look like Petitioner wanted to do what Kevin Sr. was telling him to do because Petitioner had "never done anything like that." "Kevin, Sr., when he drinks and he's - - he's drinking and he's doing them drugs he does, he is just very, very aggressive. He's just he - - you can't tell him no. He is just very aggressive and very pushy."

Deangelo testified that Kevin Sr. pointed out the victim in this case, "drove the car near where he was," and told Raymond, Robert, and Petitioner what to do. He said "someone" gave the gun to Petitioner when he got out of the car, and Robert got out of the car to "make sure it happened" since they got scared during the first robbery attempt. Deangelo agreed that Petitioner was the youngest person in the vehicle. Deangelo did not testify at Petitioner's trial, and no one from trial counsel's office spoke with him or asked him to testify. Deangelo felt that he needed to do what Kevin Sr. told him to do because he was aggressive, and there was "no way around it. He kept pushing for it." Deangelo testified that he knew what Kevin Sr. was doing, and Deangelo "kept telling [Petitioner] not to do anything at all" because he knew that "something bad was going to happen." Deangelo also said he knew that there would be "consequences" from Kevin Sr. if Petitioner did not obey him and that Kevin Sr. became physically violent when drinking and using drugs.

On cross-examination, Deangelo agreed that Kevin Sr. did not force Petitioner to drink alcohol. He was only aware of one gun used in the offenses. He said that Petitioner, Raymond, and Robert all three walked across the street to commit the robbery. Deangelo agreed that he refused to participate in the crimes and remained in the car with Kevin Sr. He further agreed that Kevin Sr. was not "standing over" Petitioner when he committed the robbery and murder but had just told him what to do. Deangelo agreed that "basically the threat" that was given by Kevin Sr. was that they had to commit the robberies to have money for gas to get home; they feared not being able to get home. However, Deangelo said there was also "more fear involved in just not being able to get home." When asked whether it was worth robbing and killing someone to get a ride home, Deangelo responded: "Well, what I am saying is it is just not about it being worth robbing and killing somebody. Because for one, it was never an intention to kill anybody. So but you worded it like that. It was never an intention to kill anybody." On redirect examination, Deangelo testified

that the gun was passed to Petitioner when it was time to commit the robbery. He said that Robert got out of the car to make sure that Petitioner and Raymond committed the robbery.

Petitioner testified that trial counsel was the third attorney to represent him in this case. He originally entered a guilty plea because he understood from his attorney that he would receive the death penalty if he did not accept the plea. Petitioner later filed a post-conviction petition and was allowed to withdraw his plea. He was "under the impression that they were trying to rush [him] to trial so they could get it over with because [he] had already pled guilty and they were just trying to rush [him] through and get [him] back to prison." At that point, he had been incarcerated for a couple of years.

Petitioner testified that he was originally supposed to be tried with Raymond. Petitioner and trial counsel agreed that his defense "was going to be duress." He agreed that trial counsel spoke to him two or three times about testifying at trial, but he did not know that trial counsel was going to mention the prior guilty plea. Petitioner did not recall practicing his testimony with trial counsel but said that trial counsel had some questions written down on a piece of paper that he gave Petitioner a couple of days before trial. Petitioner agreed that he wanted to testify "which now that I realize that I was too young and I didn't even know what was going on at the time, but I wanted to get my side out."

Petitioner did not recall when he learned his case would not be tried with Raymond's, but it was the same time he learned Raymond "would be testifying." Petitioner said he and trial counsel did not discuss the impact the severance would have on his trial. Petitioner testified: "Had he mentioned it, I know I would have told him to try to retrieve some statements that [Raymond] made at the juvenile detention center saying that - - everything that we're saying today." He also said Raymond admitted that Kevin Sr. "was the dude who was making everything happen or whatever." Petitioner explained that Raymond had told him about a statement Raymond made at the juvenile detention center; Petitioner was unable to get the statement. He agreed that trial counsel did not know about the statement and that he did not know the impact Raymond's statement would have on his case. He also said he did not know what it meant for Raymond to become the State's witness. He thought that Raymond would tell the truth.

Concerning his defense and chances at trial, Petitioner testified:

From the discussions that we had, I was under the impression that we would be seeking a defense of duress. So I felt like we could have proved that had he asked the right line of questions and called the witnesses that I had told him about[.]

Petitioner knew trial counsel planned to ask if he was the shooter since the surveillance video was going to be admitted, and trial counsel thought Petitioner needed to be honest.

- 11 -

Petitioner testified that he and trial counsel discussed lesser-included offenses, and he wanted trial counsel to "present the duress defense so [he] could receive a lesser-included offense." He said he did not intend to commit any crimes, and he felt they "could have proved that better than [they] did." Petitioner testified he was surprised by the lack of questioning concerning duress, and he did not feel that his testimony went well "[b]ecause once he brung that prior plea out, I knew that it was put in the jury's mind since I had plead guilty to something, that I already was guilty."

After Petitioner's arrest, he was sent to "Middle Tennessee Health Institute" for thirty days for a mental evaluation. He did not remember telling trial counsel about the evaluation. Petitioner recalled speaking to Dr. Stephen Montgomery in 2016 or 2017, and Petitioner answered his questions truthfully. Dr. Montgomery found that Petitioner had "low average intellect" and "impulsive control disorder." He found that Petitioner was also "intoxicated" with marijuana and alcohol at the time of the offenses. Petitioner did not know that he could call an expert to testify at trial, and trial counsel did not discuss calling Dr. Montgomery to testify on Petitioner's behalf. Petitioner testified that he would have asked trial counsel to call Dr. Montgomery to show that Petitioner was functioning at a fourth or fifth grade level and that his statement to law enforcement was not voluntarily given. He thought Dr. Montgomery's testimony would have been helpful with the jury to understand his situation.

Petitioner testified that he did not grow up with Kevin Sr. but felt that he knew Kevin Sr. well and wanted a relationship with him. He said Kevin Sr. picked him up first on the day of the offenses, and they picked up Deangelo. Before Raymond got into the car, Kevin Sr. said that he wanted to commit some robberies, and he showed Petitioner two guns. Petitioner said Kevin Sr. introduced alcohol and marijuana to them when he realized that he, Deangelo, and Raymond were not going to commit a robbery at the car lot. He agreed that there were "potentially three failed attempts" at a robbery. When asked why they did not commit the initial robberies, Petitioner said:

> Because we were scared, and we told him - - we told him at the car lot that we didn't want to do it and we were scared. And he started beating on the dashboard telling us we are going to do this and we're going to do that. So that's why the robberies didn't happen beforehand.

Petitioner testified that he saw Kevin Sr. drinking and smoking marijuana and said that Kevin Sr. was becoming aggressive. Petitioner testified that the offenses in this case occurred after he witnessed Robert's robbery of "Edwards" and Petitioner was terrified. He did not live close to the carwash and could not have walked home; Kevin Sr. would not have taken him home because they had already asked him to do so. Kevin Sr. told them he had to pick up his wife from work and needed gas money. Petitioner testified that he never held the gun while he was in the car. Robert got out of the car at the carwash because Kevin Sr. wanted Robert to make sure that Petitioner committed the robbery. Petitioner

testified that he fired one shot after the victim hit him. Petitioner testified that he had never drunk alcohol before that day, and he was feeling the effects of the alcohol and the marijuana. It was not his idea to rob the victim, but he did not feel like he had any choice because Kevin Sr. told him to do it and sent Robert with him to make sure he did.

Petitioner testified that if he could "go back," he would not have testified because he was "still a child" and did not "understand what was going on." He agreed that he was the person in the surveillance video shown to the jury. Petitioner testified that he hit the victim from behind but did not ask him for anything because the victim hit him back and ran away. Petitioner shot him as he ran. He said: "It was a reflex more than anything." Petitioner testified that he was not "able" to testify at trial as to everything that happened before the shooting because due to his age, he did not realize that some of the information was relevant. Petitioner agreed that no one told him to kill the victim as he ran away, "[i]t was more of a reflex once he hit me." He felt that the psychiatric reports would have shown that the shooting was a reflex. Petitioner agreed that Kevin Sr. was across the street when Petitioner shot the victim. He said that he and Robert walked up to the victim, and Raymond arrived "later on down the line." Petitioner agreed that he and trial counsel made the decision together as to whether he would testify at trial.

Dr. Steven Montgomery, a forensic psychiatrist, had testified during Petitioner's first post-conviction hearing. A transcript of Dr. Montgomery's testimony and his forensic evaluation of Petitioner were admitted as exhibits. Dr. Montgomery testified that post-conviction counsel had asked him to review Petitioner's case and provide an opinion as to whether "further psychiatric evaluation could have been helpful for his case." Dr. Montgomery did not conduct a competency evaluation or form an opinion as to Petitioner's sanity at the time of the offenses. He reviewed a prior evaluation of Petitioner from February 2008 which concluded that Petitioner was "in the low-average" intellectual range, "with a full scale IQ of around 88." Petitioner's educational testing also reflected that he was "functioning at about seventh grade level," even though he was repeating tenth grade "for the second or third time." Dr. Montgomery felt that Petitioner could have undergone additional testing since he was given an abbreviated test and was unable to complete all parts.

Dr. Montgomery completed a forensic psychiatric evaluation report on November 18, 2015. He interviewed Petitioner virtually but never in person. Dr. Montgomery found that "there was no family history of psychiatric illness" and some "substance use disorders." He noted that Kevin Sr. had been "verbally and physically abusive" to Petitioner's mother. Petitioner had been in trouble for fighting at school but reported that he did not have a history of substance abuse. Kevin Sr. had given Petitioner alcohol and marijuana on the day of the offenses.

Dr. Montgomery concluded that Petitioner was not psychotic but likely had some sort of impulse control disorder. His "impression" from the "limited information" was that

Petitioner was "more susceptible than the average person to being influenced" by adult family members including Kevin Sr. and Robert. Dr. Montgomery felt that this susceptibility "probably further degraded [Petitioner's] ability to control impulses," which could have been further impaired by substance use. He also found that Petitioner's sixteen-year-old brain was not "fully developed and could have further contributed to being more susceptible to anyone trying to override his decision-making." Dr. Montgomery concluded that Petitioner's initial psychological testing warranted additional investigation, "[e]specially given the prior psychological evaluation showed low cognitive functioning that they also thought that there was the impulse control disorder and just the whole scenario of the events, with the alcohol and drugs and other adults being involved."

The post-conviction court entered a written order on August 13, 2024, with factual findings from the post-conviction hearing and consideration of each of Petitioner's claims of ineffective assistance of counsel. The post-conviction court accredited trial counsel's testimony and concluded that Petitioner failed to show by clear and convincing evidence that trial counsel rendered deficient performance or that Petitioner had proven any prejudice.

## Analysis

On appeal, Petitioner claims the post-conviction court erred in denying him relief on his claims of ineffective assistance of counsel. He contends that trial counsel was ineffective for failing to seek a continuance, failing to establish a defense, calling Petitioner, who was a minor, to testify at trial, and failing to call an expert witness. Petitioner further argues that trial counsel's representation resulted in prejudice and that he is entitled to relief based on the cumulative effect of trial counsel's errors. The State responds that Petitioner failed to demonstrate any deficient performance or prejudice. We agree with the State.

Initially, the State argues that Petitioner has waived his post-conviction claims by failing to include the trial transcript in the record on appeal. However, at oral arguments, post-conviction counsel requested that we take judicial notice of the trial record. This court may take judicial notice whether requested or not and may do so at any stage of the proceeding. *State v. Lawson*, 291 S.W.3d 864, 869 (Tenn. 2009). This court "may consider ... any additional facts ... judicially noticed." Tenn. R. App. P. 13(c); *see also State ex rel. Wilkerson v. Bomar*, 376 S.W.2d 451, 453 (Tenn. 1964). Accordingly, we take judicial notice of the trial transcripts and record.

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. Because the right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee, the denial of

effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act. *See* U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020).

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this Court reviews de novo." *Phillips v. State*, 647 S.W.3d 389, 400 (Tenn. 2022) (citing *Dellinger v. State*, 279 S.W.3d 282, 294 (Tenn. 2009)). As an appellate court, we are bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings. *Howard*, 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State*, 40 S.W.3d 450, 456 n.4 (Tenn. 2001). The same does not hold true for the post-conviction court's conclusions of law which are reviewed de novo with no presumption of correctness. *Howard*, 604 S.W.3d at 57; *Holland v. State*, 610 S.W.3d 450, 455 (Tenn. 2020).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick*, 454 S.W.3d at 457 (quoting *Strickland*, 466 U.S. at 688); *see also Baxter v. Rose*, 523 S.W.2d 930, 932-33 (Tenn. 1975). Under *Strickland*, this court starts with "the strong presumption" that counsel exercised reasonable judgment in all significant decisions. *Kendrick*, 454 S.W.3d at 458 (citing *Strickland*, 466 U.S. at 689).

To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Kendrick*, 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick*, 454 S.W.3d at 458 (citing *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)). When the proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of evidence at trial).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit v. State*, 452 S.W.3d 779, 786-87 (Tenn. 2014). Accordingly, if either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d

307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the fact of counsel's alleged error by clear and convincing evidence." *Phillips*, 647 S.W.3d at 401 (quoting *Dellinger*, 279 S.W.3d at 294); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. 28, § 8(D)(1).

## I.     Ineffective Assistance of Counsel

### A. Failure to Request a Continuance

Petitioner argues that trial counsel was ineffective for failing to request a continuance after learning that Petitioner's case would be severed from Raymond's and that Raymond would testify against Petitioner at trial. Concerning this claim, the post-conviction court found:

> Recognizing that [Petitioner's] trial attorney had the duty to reasonably investigate the case and challenge certain evidence, this Court does not believe that [trial counsel] neglected that duty. The court notes that [trial counsel] represented [Petitioner] for nearly four (4) months before the commencement of the trial. The Court accredits [trial counsel's] post-conviction testimony that after a review of material of [Petitioner's] two prior attorneys and believing that his trial strategy did not change after learning that [Raymond] would present trial testimony on behalf of the State, he believed that he was as prepared to proceed to trial as he could have been. [Trial counsel] testified that he engaged two (2) investigators who interviewed witnesses, and that [trial counsel] followed up by conducting additional interviews of witnesses. The Court notes that [Petitioner] has failed to demonstrate how a continuance could have been beneficial in the defense of his case. As it relates to [trial counsel's] failure to investigate [Raymond's] testimony in any Juvenile Court proceeding, the Petitioner has failed to provide such testimony for the post-conviction court's consideration of its potential impact on impeachment of [Raymond's] testimony. As such, the Court does not find that clear and convincing evidence exists that [trial counsel's] performance was deficient on these issues.

We conclude that the record supports the post-conviction court's findings. Trial counsel testified that he "spent a whole lot of time" reviewing the extensive work from Petitioner's prior attorneys, reviewed the case with an investigator, and discussed the case with Raymond's trial counsel. He also consulted with other attorneys. Trial counsel testified that because he was confident in what he knew about the case, he did not believe the severance of Raymond's charges changed his trial strategy and he was not surprised by any of Raymond's testimony at trial. Although Petitioner claims he heard Raymond make a prior inconsistent statement, Petitioner conceded that he had not been able to obtain any such statement, and he did not call Raymond to testify at the post-conviction hearing.

- 16 -

When asked why he did not believe that a continuance would have been helpful after the severance, trial counsel noted the overwhelming evidence against Petitioner, including the surveillance video showing the shooting and Petitioner's confession and said, "Man, after you went through that record file, I don't think there was a whole lot that was going to help anything, to be honest with you, sir."

Petitioner further claims that trial counsel improperly asserted that he would not have had access to Raymond's statement until after Raymond testified. However, Petitioner does not specifically explain which of Raymond's statements he was entitled to, nor did he present any statements at the post-conviction hearing.

The record supports the post-conviction court's determination that Petitioner failed to demonstrate that trial counsel was deficient for failing to request a continuance and that trial counsel's failure to request a continuance resulted in prejudice. Petitioner is not entitled to relief on this claim.

### B. Failure to Present Duress or Undue Influence as a Defense

Petitioner next argues that trial counsel rendered deficient performance by failing to "mention duress or undue influence in his opening statements or his case in chief." He also asserts that trial counsel presented no evidence at trial to support the defense. Concerning this claim, the post-conviction court found:

> It is well established that trial courts have an obligation to properly instruct the jury "so that each issue of fact raised by the [evidence] will be submitted to the jury on proper instructions." *State v. Dorantes*, 331 S.W.3d 370, 390 (Tenn. 2011) (citing *State v. Faulkner*, 154 S.W.3d 48, 58 (Tenn. 2005); *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001); *State v. Garrison*, 40 S.W.3d 426, 432 (Tenn. 2000)). To support an instruction for duress, the proof would have to establish:

> > [T]he person or a third person is threatened with harm that is present, imminent, impending and of such a nature to induce a well-grounded apprehension of death, serious bodily injury, or grave sexual abuse if the act is not done. The threatened harm must be continuous throughout the time the act is being committed, and must be one from which the person cannot withdraw in safety. Further, the desirability and urgency of avoiding the harm must clearly outweigh the harm sought to be prevented by the law proscribing the conduct, according to ordinary standards of reasonableness.

> Tenn. Code Ann. § 39-11-504(a).

- 17 -

           \*        \*        \*

In the present case, this Court accredits [trial counsel's] post-conviction testimony that he strategically chose to pursue the position that [Petitioner] was unduly influenced by his father. He also testified that he believed that he did not have a reasonable legal basis to request a jury instruction for duress. Considering the legal elements required to establish duress pursuant to Tennessee Code Annotated § 39-11-504(a), this Court finds that [Petitioner] has failed to demonstrate that [trial counsel] was deficient in his failure to pursue the defense of duress and request a jury instruction for such. The Court notes and accredits the post-conviction testimony of [Petitioner] and his brother, DeAngelo Buford, that they were afraid of [Kevin Sr.], and that they felt that they had no choice but to participate in the robberies, including that of the [victim] so that they would be able to get home. However, there was no post-conviction testimony or evidence presented that established that the Petitioner was "threatened with harm that [was] present, imminent, impending and of such a nature to induce a well-grounded apprehension of death, serious bodily injury, or grave sexual abuse if the act [was] not done." Tenn Code Ann. § 39-11-504(a). Although [trial counsel's] strategy of pursuing the position of undue influence, rather than duress, was ultimately not successful, the Court finds that the Petitioner has failed to demonstrate that [trial counsel's] decision to pursue such defense, rather than the defense of duress, was unreasonable. *See Goad v. State*, 938 S.W.2d at 369.

The record supports the post-conviction court's findings. Although trial counsel did not recall whether he mentioned duress or undue influence during his opening statements, and the record does not indicate that he requested a jury instruction on such, his strategy was for Petitioner to testify about the influence Kevin Sr. had on his actions. Petitioner gave him the best chance to convince the jury that Petitioner was unduly influenced, and "[t]he only corroborating evidence I would have said I had was just kind of what the record as a whole reflected and the way that certain events went down that night." Trial counsel also noted that Raymond's testimony would have minimized the influence Kevin Sr., or any other adult, would have had over Petitioner. Trial counsel did not believe that he had a legal basis to ask for a jury instruction on duress.

While Deangelo testified at the post-conviction hearing that Kevin Sr. was "very aggressive," "very pushy," and could become "physically violent" when drinking and using drugs, had Deangelo testified at trial, such testimony did not support a defense of duress under Tennessee Code Annotated section 39-11-504(a). Deangelo agreed that Kevin Sr. never directed Petitioner to kill the victim.

- 18 -

Likewise, Petitioner's testimony at the post-conviction hearing did not support a defense of duress. Petitioner testified that Kevin Sr. was aggressive and that he was terrified after witnessing Robert rob "Edwards", but Petitioner did not testify that Kevin Sr. threatened him into the attempted robbery and shooting. Petitioner said he felt that he did not have a choice about robbing the victim because Kevin Sr. told him to do it and sent Robert with him. He also feared Kevin Sr. would not give him a ride home if he did not commit the robbery. Petitioner testified that Kevin Sr. never told him to kill the victim, rather it was just a "reflex" after the victim hit him. "[T]he defense of duress requires that the 'threatened harm must be ... one from which the person cannot withdraw in safety.'" *State v. Cole-Pugh*, 588 S.W.3d 254, 262 (Tenn. 2019). Clearly, the facts here do not support the defense of duress.

Like the post-conviction court, we conclude that because a duress defense was not supported by the evidence, trial counsel was not ineffective in failing to pursue the defense or ask for a jury instruction. As for undue influence, although trial counsel may not have mentioned those specific words in his argument, he presented evidence throughout the trial that Petitioner was influenced by Kevin Sr. Petitioner testified that meeting Kevin Sr. was important to him. *Buford*, 2011 WL 6916443, at *4. He said that Kevin Sr. was mad and frustrated when he, Raymond, and Deangelo failed to complete the robberies because they were scared. *Id.* Moreover, Petitioner's mother testified that because Kevin Sr. was an "abusive person," she did not approve of Petitioner meeting him. *Id.* at *8.

Likewise, Raymond testified that Kevin Sr. was directing him, Petitioner, and Deangelo to commit the robberies, and that they were scared. *Id.* at *2-3. Raymond further said that Kevin Sr. was not happy and was frustrated after their initial failed robbery attempts. *Id.* On direct appeal, this court in considering the sufficiency of the evidence for Petitioner's attempted especially aggravated robbery charge found that "[d]efense counsel did an excellent job in presenting the complexities of [Petitioner's] relationship with his father and the influence of the father on [Petitioner] at the time of these crimes." *Id.* at *8. The record shows that trial counsel presented evidence of undue influence, and "[t]he jury based upon the verdict, did not accredit the defense theory that [Petitioner's] will . . . was overcome by the actions and demands of his father." *Id.* "The fact that a particular strategy or tactical decision failed does not by itself establish deficiency." *Felts v. State*, 354 S.W.3d 266, 277 (Tenn. 2011) (citing *Goad*, 938 S.W.2d at 369). Courts should therefore not judge counsel's performance with the benefit of hindsight. *Kendrick*, 454 S.W.3d at 458 (citing *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013)).

The record supports the post-conviction court's determination that Petitioner failed to demonstrate that trial counsel was deficient in the defense strategy regarding duress and undue influence and that Petitioner failed to prove prejudice. Petitioner is not entitled to relief on this claim.

## C. Calling Petitioner to Testify at Trial

Petitioner contends that trial counsel rendered deficient performance by calling him to testify at trial because he was a "minor child" and "proceeded to ask [Petitioner] a series of questions that effectively [sealed] Petitioner's fate." Concerning this claim, the post-conviction court concluded:

> In the present case, [trial counsel] admitted that, although he knew the trial court prohibited evidence of [Petitioner's] withdrawn guilty plea, he solicited testimony from [Petitioner] for the purpose of demonstrating to the jury [Petitioner's] honesty with the hopes of securing a conviction to a lesser[-]included offense. [Trial counsel] stated that he talked with [Petitioner] several times prior to trial about the benefits and risks of testifying. Viewing his tactic in hindsight, while it may be that [trial counsel] could have employed a different strategy in presenting his client's character to the jury, this Court does not second guess [trial counsel's] strategy, nor is it found to have been improper. Therefore, the Court finds that [Petitioner] has failed to show clear and convincing evidence that his trial attorney was deficient on this issue.

The record supports the post-conviction court's findings as to this claim. Trial counsel and Petitioner both testified that the decision for Petitioner to testify at trial was made together. Indeed, Petitioner testified at the post-conviction hearing that he wanted to testify and "get [his] side out." Trial counsel testified that the evidence against Petitioner was overwhelming but that

> I thought by [Petitioner] getting up there they could see him as I saw him, as a young man, because he's a likeable guy. He was a likeable guy. And I wanted the jury to see that side of him as being somebody, not this monster that he had kind of portrayed out to be, and just being somebody that was steered wrong. Because he is personable. I liked my time with him.

The record also supports the post-conviction court's finding that trial counsel made a strategic decision to have Petitioner admit his involvement in the shooting. Trial counsel testified that through Petitioner's testimony, "that's where we were going to start talking about the influence that [Petitioner] was put under in order to go through with that[.]" We also note that by the time Petitioner testified at trial, the State had already introduced Petitioner's police interview, during which he admitted to the shooting, and the surveillance video showing the shooting. We conclude Petitioner's admission at trial did not result in prejudice.

Likewise, trial counsel made a strategic decision to elicit testimony from Petitioner that he had previously pled guilty to the offenses but later withdrew his plea. Trial counsel

testified that due to Petitioner's young age, he feared that Petitioner would mention the plea, and trial counsel wanted to "get out any type of negative inferences" before getting to the "meat" of Petitioner's testimony. Trial counsel testified that he made a strategic decision as to how to question Petitioner in hopes of having the jury view him as a "kid" and "somebody who has a personality and something to offer." He wanted to show the jury that Petitioner was honest by asking him about the withdrawn guilty plea. We will not second-guess trial counsel's reasonable trial strategy.

The record supports the post-conviction court's determination that Petitioner failed to demonstrate that trial counsel was deficient for calling Petitioner to testify and that Petitioner failed to show prejudice from his decision to testify. Petitioner is not entitled to relief on this claim.

### D. Failure to Call an Expert Witness to Testify

Petitioner argues that trial counsel was ineffective for failing to call an expert witness to testify in support of his defense of duress or undue influence. Concerning this claim, the post-conviction court found:

As part of his claim on the issue of his trial attorney's failure to establish duress, [Petitioner] includes [trial counsel's] failure to adequately explore the issue by failing to retain a psychological expert to opine as to whether a further psychological evaluation could have been beneficial to the defense. To this issue, the Court considers the post-conviction testimony of Dr. Stephen Montgomery. Dr. Montgomery testified in a previous hearing that he reviewed the prior psychological evaluation performed on [Petitioner] in 2008, and that the main findings were that [Petitioner] had a low IQ of approximately 88. Dr. Montgomery testified that [Petitioner] struggled with some of the tests performed by Dr. Montgomery because of his (the Petitioner's) low IQ, and that there was some family history of psychiatric issues. Dr. Montgomery testified that [Petitioner] was functioning at a seventh grade level. Dr. Montgomery believed additional testing could have revealed more information. Dr. Montgomery testified that [Petitioner] was not psychotic or depressed but had some form of impulse control disorder. Dr. Montgomery believed that [Petitioner] was more susceptible than the average person to being influenced because he was a juvenile and because of his impulse control disorder.

The Court again accredits [trial counsel's] testimony that in his preparation of this case, and after a review of a prior mental health evaluation that concluded that [Petitioner] had impulse control issues, [trial counsel] did not find it beneficial to request a second mental health evaluation because he did not believe that there would have been a substantive change in the outcome.

Upon review of Dr. Montgomery's post-conviction testimony, acknowledging his findings that [Petitioner] is susceptible to influence, the Court finds Dr. Montgomery's testimony fails to establish the factors for duress as outlined above. As such, the Court finds that [Petitioner] has failed to establish that his trial attorney was deficient on this issue.

The record supports the post-conviction court's findings as to this claim. Dr. Montgomery's testimony did not support a defense of duress under Tennessee Code Annotated section 39-11-504(a). He declined to opine concerning Petitioner's sanity at the time of the offense. Based on Dr. Montgomery's virtual interview of Petitioner, he opined that Petitioner had an impulse control disorder and was "in the low-average intellectual range." His impression from the "limited information" was that Petitioner was "more susceptible than the average person to being influenced" by adult family members such as Kevin Sr. and Robert and that this susceptibility "probably further degraded [Petitioner's] ability to control impulses." Dr. Montgomery found that the matter was further complicated because Petitioner's sixteen-year-old brain was not "fully developed and could have further contributed to being more susceptible to anyone trying to override his decision making." He concluded that Petitioner's initial psychological testing warranted additional investigation. However, Dr. Montgomery's testimony did not establish that Petitioner had any serious mental health or developmental issues. Dr. Montgomery did not specifically find that Petitioner acted under undue influence at the time of the offenses. We note that at the time of the second post-conviction hearing, Petitioner presented no additional evidence of further psychological testing.

Furthermore, trial counsel testified that based on his review of Petitioner's juvenile court psychological evaluation and Petitioner's school records, he made the decision not to seek an expert witness because the records contained no indication that Petitioner was incompetent or had diminished capacity. His strategy was for Petitioner to testify about Kevin Sr.'s influence over him. Trial counsel testified that Petitioner gave him the best chance to convince the jury that Petitioner was under undue influence, and as previously noted by this court on direct appeal, trial counsel successfully presented the complexities of Petitioner's relationship and the influence of Kevin Sr. on Petitioner at the time of the offenses. *Buford*, 2011 WL 6916443, at *8.

The record supports the post-conviction court's determination that Petitioner failed to demonstrate that trial counsel was deficient for failing to call an expert to testify in support of a defense of duress or undue influence and that Petitioner failed to prove prejudice. We will not second-guess trial counsel's strategic decision. Trial counsel did present evidence of undue influence to the jury and the evidence of Petitioner's guilt was overwhelming. Petitioner is not entitled to relief on this claim.

## II. Cumulative Error

Finally, Petitioner contends that he is entitled to relief based upon the cumulative effect of trial counsel's multiple instances of deficient performance and that he was prejudiced by same. "When an attorney has made a series of errors that prevents the proper presentation of a defense, it is appropriate to consider the cumulative impact of the errors in assessing prejudice" of an ineffective assistance of counsel allegation. *McKinney v. State*, No. W2006-02132-CCA-R3-PD, 2010 WL 796939, at *37 (Tenn. Crim. App. Mar. 9, 2010). More than one instance of deficient performance, when considered collectively, can result in a sufficient showing of prejudice pursuant to *Strickland*. *Id.* The question is whether counsel's deficiencies "cumulatively prejudiced the ... right to a fair proceeding and undermined confidence in the outcome of the trial." *Id.* Here, we need not consider the cumulative effect of any alleged errors because Petitioner has failed to demonstrate multiple errors, much less a single error in any of his issues. *See also State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015). Petitioner is not entitled to relief.

## CONCLUSION

We conclude that the record supports the post-conviction court's finding that Petitioner was not denied the effective assistance of counsel. For the foregoing reasons, the judgment of the post-conviction court is affirmed.


S/ *Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE